IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TETRA CORPORATE SERVICES, LLC, a Utah limited liability company,<br><br>                Plaintiff,<br><br>v.<br><br>CAPITALPLUS EQUITY, LLC, a Nevada limited liability company; CAPITALPLUS FINANCIAL, LLC, a Tennessee limited liability company; CAPITALPLUS SUPPLY CHAIN PARTNERS, LLC, a Tennessee limited liability company; SCOTT APPLEGATE, an individual; CAPITALPLUS FINANCIAL SERVICES, LLC, a Tennessee limited liability company; CAPITALPLUS SUPPLY, LLC, a Tennessee limited liability company; CAPITALPLUS CONSTRUCTION SERVICES, LLC, a Delaware limited liability company; CAPITALPLUS SUPPLY CHAIN PARTNERS SPV 1, LLC, a Delaware limited liability company,<br><br>                Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO DISMISS**<br><br>Case No. 2:24-cv-00399-TC-CMR<br><br>Judge Tena Campbell<br>Magistrate Judge Cecilia M. Romero |

       Before the court is the Defendants' Motion to Dismiss the Amended Complaint. (ECF No. 14.) For the reasons stated below, the court denies that motion.

### BACKGROUND[1]

       On November 3, 2004, Plaintiff Tetra Corporate Services, LLC (TCS) and Defendant Capitalplus Equity, LLC (CP Equity) signed a promissory note (the Note). (Am. Compl. ¶ 24,

---

[1] The court accepts the Complaint's well-pled allegations as true for the purposes of this order. See Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., 771 F.3d 697, 700 (10th Cir. 2014).

1

ECF No. 12.) As of May 1, 2021, CP Equity owed TCS $2,800,000.00 under the Note. (Id.) On that date, TCS and CP Equity signed a Sixteenth Amendment to the Note (the Amended Note). (Id. ¶ 25.) The Amended Note stated that CP Equity would "make monthly payments of $76,000 of principal and interest on the first day of each calendar month beginning on June 1, 2021" and would repay "all principal due under the Note on or before May 1, 2024." (Id. ¶ 26.) The Amended Note also required CP Equity to provide TCS with monthly and annual financial statements. (Id. ¶ 27.)

The Amended Note included a Guarantee signed by three Guarantors: Capitalplus Financial, LLC (CP Financial); Capitalplus Supply Chain Partners, LLC (CP Supply Chain); and Scott Applegate (collectively, the Guarantee Defendants). (Id. ¶¶ 3–6, 30.) Section 1 of the Guarantee provided:

> Beginning on the date hereof, (a) each Guarantor hereby personally and unconditionally guarantees the payment of the Guaranteed Amounts under the Note to Lender; and (b) each Guarantor hereby agrees to reimburse Lender for any and all amounts of the Note that the Company fails to pay under the terms of the Note, jointly and severally, within five (5) business days of being notified by Lender that the Company has not fulfilled its payment obligations under the Note.

(Id. ¶ 35.)

TCS alleges that CP Equity breached the Amended Note when it failed to make a payment in April 2023 or any subsequent payments. (Id. ¶ 31–32.) TCS further alleges that CP Equity failed to make the required financial disclosures and that the Guarantee Defendants breached the Guarantee. (Id. ¶¶ 34, 36.)

TCS maintains that CP Equity and the Guarantee Defendants used other previously formed and new corporate entities as fraudulent alter egos to avoid CP Equity's repayment obligations. (Id. ¶ 37.) Specifically, TCS alleges that CP Equity and the Guarantee Defendants established the following four entities: 1) Capitalplus Construction Services, LLC

(CP Construction) in July 2018; 2) Capitalplus Supply Chain Partners SPV 1, LLC (CP Supply SPV) in February 2021; 3) Capitalplus Financial Services, LLC (CP Services) in March 2023; and 4) Capitalplus Supply, LLC (CP Supply) in June 2023.  (Id. ¶¶ 38, 41–43.)  Collectively, TCS refers to these entities as the Alter Ego Defendants.

Like CP Equity and the Guarantee Defendants, the Alter Ego Defendants all work in the construction financing business and share a principal office address at 2510 Solway Road, Knoxville, Tennessee.  (Id.)  The Alter Ego Defendants use the same website and telephone number as CP Equity and the Guarantee Defendants.  (Id. ¶ 17.)  And there is substantial overlap of ownership, as each of the limited liability company Defendants is owned by Mr. Applegate, the Applegate Family Partnership, or members of the Applegate family.[2]  (Not. Removal ¶¶ 3–7, ECF No. 2.)  TCS maintains that the Alter Ego Defendants share the same employees, officers, and directors as CP Equity and the Guarantee Defendants.  (Am. Compl. ¶¶ 67–68.)

TCS's central allegation against the Alter Ego Defendants is that CP Equity and the Guarantee Defendants transferred assets to the Alter Ego Defendants to avoid paying the outstanding debt on the Amended Note.  (Id. ¶ 37.)  To support this assertion, TCS notes that two of the Alter Ego Defendants were formed in March 2023 and June 2023, about the same time that CP Equity stopped making its monthly payment on the Amended Note.  (See id. ¶¶ 32, 38, 41.)  TCS also points to press releases indicating that the Alter Ego Defendants were pursuing business projects even when CP Equity and the Guarantee Defendants represented to TCS that they had no assets.  (Id. ¶ 45.)  For instance, a press release in February 2024 touted that CP Construction was a "provider of accounts receivable financing for the construction

---

[2] The one exception is CP Financial, which is owned in part by the Applegate Family Partnership and in part by four Tennessee residents: Richard James, Curtis Powell, Laura Lawson, and Brett Barboza.  (Not. Removal ¶ 6.)

industry" and identified representative transactions of around $5 million. (Id. ¶ 44.) And a press release on April 2, 2024, stated that "CapitalPlus Financial Services, a leading provider of receivable financing of the construction industry, is pleased to announce the successful funding of a $1.25 million working capital facility for a finishing contractor based in Reno, Nevada." (Id. ¶ 39.)

TCS then filed this lawsuit in Utah state court. (See Compl., ECF No. 2-1.) The Defendants removed the case to federal court on June 3, 2024. (ECF No. 2.) The court found that the Defendants' first motion to dismiss (ECF No. 9) was rendered moot upon the filing of TCS's Amended Complaint, which TCS filed as a matter of right under Rule 15(a) of the Federal Rules of Civil Procedure. (See Dkt. Text Order, ECF No. 13.) The Defendants then brought a motion to dismiss the Amended Complaint. (ECF No. 14.)

## LEGAL STANDARD

To survive a motion to dismiss, the factual allegations in a complaint must raise a plausible right to relief. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–56 (2007). A claim is facially plausible when the plaintiff pleads enough factual content to justify the reasonable inference the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). And while factual allegations asserted in a complaint are accepted as true for purposes of a motion to dismiss, conclusory allegations in a complaint are not entitled to such deference and are insufficient to state a claim. Id.

## ANALYSIS

TCS asserts four causes against the Defendants. First, TCS asserts a breach of contract claim against CP Equity. (Am. Compl. ¶¶ 47–51.) Second, TCS asserts a claim for breach of the

4

Guarantee against the Guarantee Defendants.  (Id. ¶¶ 52–56.)  No Defendants have moved to dismiss these causes of action.

Third, TCS asserts a claim for violations of Utah's Uniform Voidable Transactions Act (UVTA), Utah Code Ann. § 25-6-101, et seq., against all Defendants.  (Am. Compl. ¶¶ 57–62.)  Finally, TCS asserts a claim for alter ego and/or successor liability against the Alter Ego Defendants.  (Id. ¶¶ 63–73.)

The Alter Ego Defendants move to dismiss the claims against them, arguing that the court lacks personal jurisdiction over them.  All Defendants also move to dismiss the UVTA claim for failure to state a claim on which relief may be granted.

I. **Personal Jurisdiction**

"Personal jurisdiction can be acquired through either general jurisdiction or specific jurisdiction."  Xmission, L.C. v. Fluent LLC, 955 F.3d 833, 840 (10th Cir. 2020).  TCS maintains the court has specific jurisdiction over the Defendants in this action.  "Specific jurisdiction … allows a court to exercise jurisdiction over an out-of-state defendant only for claims related to the defendant's contacts with the forum State."  Id.

To determine whether this court has jurisdiction, the court must analyze whether exercising jurisdiction over the Defendants comports with due process.[3]  Id. at 839.  To do this, the court considers whether the Defendants have minimum contacts with Utah "such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial

---

[3] "A federal court may not exercise personal jurisdiction over an out-of-state defendant unless (1) an applicable statute authorizes service of process on that defendant and (2) the exercise of statutory jurisdiction comports with constitutional due process."  Xmission, 955 F.3d at 839.  Utah's long-arm statute applies, but it "confers jurisdiction 'to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution.'"  Id. (quoting Fenn v. Mleads Enters., Inc., 137 P.3d 706, 710 n.10 (Utah 2006)).  "The two-step analysis thus collapses here into a single due-process inquiry."  Id.

justice.'" Dudnikov v. Chalk & Vermillion Fine Arts, Inc., 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  That is, a defendant's contacts with the forum state "must be such that the defendant should reasonably anticipate being haled into court there.'" Xmission, 955 F.3d at 839–40 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

TCS has the burden to establish jurisdiction, but because the court is not conducting an evidentiary hearing TCS need only make a prima facie showing that personal jurisdiction exists. See id. at 839.  TCS can establish jurisdiction through affidavits or other written materials, including the complaint (to the extent the Defendants have not presented evidence contradicting those allegations).  See id.  The court must take uncontroverted well-pled allegations in the complaint as true.  See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995).  If the plaintiff establishes the defendant has minimum contacts with the forum state, the defendant, to avoid litigating in the forum state, must present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." Xmission, 955 F.3d at 840 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

Here, the parties do not dispute that the court has specific jurisdiction over CP Equity and the Guarantee Defendants.  The court agrees that by signing the Amended Note with TCS, a Utah limited liability company whose members are citizens of Utah, these Defendants purposefully directed activities at residents of the forum state.  See id. (quoting Burger King, 471 U.S. at 472); see also Old Republic Ins. Co. v. Cont'l Motors, Inc., 877 F.3d 895, 907 (10th Cir. 2017) (holding that a plaintiff may establish purposeful direction by showing that "an out of-state defendant's intentional conduct targets and has substantial harmful effects in the forum state").  Those activities satisfy the harmful effects test that the Supreme Court of the United States laid

out in Calder v. Jones, 465 U.S. 783 (1984). Calder requires a plaintiff to show that the defendant (1) intentionally committed an act (2) expressly aimed at the forum state (3) with the "knowledge that the brunt of the injury" would be felt in that state. Dudnikov, 514 F.3d at 1072. Moreover, TCS has established that its alleged injuries arose out of, or are related to, these Defendants' activities. See Xmission, 955 F.3d at 840.

TCS has therefore adequately alleged that CP Equity and the Guarantee Defendants have minimum contacts with Utah, thereby establishing a prima facie case of specific personal jurisdiction. And because these Defendants present no reasons why the exercise of personal jurisdiction over them would "offend traditional notions of fair play and substantial justice," id. at 839 (cleaned up), the court finds that the exercise of jurisdiction over these Defendants is appropriate.

The Alter Ego Defendants nevertheless argue that the court lacks personal jurisdiction over them because they did not sign the Amended Note or otherwise direct any activities at the forum state. But where a plaintiff adequately alleges that a defendant is subject to alter ego liability, the court agrees with the analysis in an opinion issued by the Honorable Robert J. Shelby, in which he held that the court may impute the jurisdictional contacts from one defendant to an alter ego defendant:

> In most instances, minimum contacts must be found as to each defendant over whom the court exercises jurisdiction. However, as the Tenth Circuit—and other circuits—have recognized, it is consistent with due process to impute contacts from one defendant to another when certain relationships between them exist: where the defendants have an agency relationship; when a successor business entity takes over assets from its predecessor; and when two defendants are alter egos of one another. Imputation under such circumstances is based on the theory that, because the two corporations (or the corporation and its individual alter ego) are the same entity, the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of the International Shoe due process analysis.

Larada Sciences, Inc. v. Pediatric Hair Sols. Corp., No. 2:18-cv-551-RJS-JCB, 2023 WL 2043300, at *13 (D. Utah Feb. 16, 2023) (cleaned up). The jurisdictional question that the court must determine, then, is whether TCS has "sufficiently alleged that the two entities were alter egos of one another, meeting the prima facie burden for jurisdiction." Id., at *15.

An alter ego claim is a theory of liability, not an independent claim for relief. Jones & Trevor Mktg., Inc. v. Lowry, 284 P.3d 630, 634 n.1 (Utah 2012), overruled in part on other grounds by Salo v. Tyler, 417 P.3d 581 (2018). "Ordinarily, a corporation is regarded as a separate and distinct legal entity from its stockholders." Dockstader v. Walker, 510 P.2d 528 (1973). This separation "insulate[s] the stockholders from the liabilities of the corporation, thus limiting their liability to only the amount that the stockholders voluntarily put at risk." Salt Lake City Corp. v. James Constructors, Inc., 761 P.2d 42, 56 (Utah Ct. App. 1988) (citation omitted). The alter ego doctrine is an exception to this general rule. See Jones & Trevor Mktg., 284 P.3d at 635. "If a party can prove its alter ego theory, then that party may 'pierce the corporate veil' and obtain a judgment against the individual shareholder even when the original cause of action arose from a dispute with the corporate entity." Id. (citation omitted).

Under Utah law, TCS must demonstrate two elements to succeed on an alter ego theory. First, there must be "such unity of interest and ownership that the separate personalities of the corporation no longer exist …." Norman v. Murray First Thrift & Loan Co., 596 P.2d 1028, 1030 (Utah 1979). In other words, "the corporation is, in fact, the alter ego of one or a few individuals …." Id. Second, TCS must show that "the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." Id. The first element is known as the "formalities requirement," while the second element is called the "fairness requirement" and is addressed to the "conscience of the court." James Constructors, 761 P.2d

8

at 47.

The Utah Court of Appeals has articulated eight factors that courts should consider when evaluating claims predicated on a theory of alter ego liability:

> (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant shareholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a façade for operations of the dominant stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or fraud.

Colman v. Colman, 743 P.2d 782, 786 (Utah Ct. App. 1987). The Utah Supreme Court has since adopted the Colman factors "with the caveat that they are … only non-exclusive considerations." Jones & Trevor Mktg., 284 P.3d at 637. The Utah Supreme Court has also clarified that "the first seven Colman factors relate to the formalities element of the alter ego test, while the eighth Colman factor is merely a restatement of the fairness element." Id.

Although much of Utah law explaining the alter ego doctrine has been developed in the context of a corporation and its shareholders, Utah courts have extended the doctrine to a parent corporation and its subsidiary. See, e.g., James Constructors, 761 P.2d at 47. "In the parent-subsidiary situation, the central focus of the formalities prong is 'the degree of control that the parent exercises over the subsidiary and the extent to which the corporate formalities of the subsidiary are observed.'" Id. (citation omitted). Favorably citing to a case from the United States District Court for the District of Minnesota, the Utah Court of Appeals noted "eleven factors relevant to deciding whether the parent exercises 'the necessary control' over its subsidiary." Id. (citing United States v. Advance Mach. Co., 547 F. Supp. 1085, 1093 (D. Minn. 1982)). Those factors are:

> (a) The parent corporation owns all or most of the capital stock of the subsidiary;
>
> (b) The parent and subsidiary corporations have common directors and officers;

9

(c) The parent corporation finances the subsidiary;

(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;

(e) The subsidiary has grossly inadequate capital;

(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary;

(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;

(h) In the papers of the parent corporation or in the statement of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own;

(i) The parent corporation uses the property of the subsidiary as its own;

(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest;

(k) The formal legal requirements of the subsidiary are not observed.

Advance Mach. Co., 547 F. Supp. at 1093 (citing C M Corp. v. Oberer Dev. Co., 631 F.2d 536, 539 (7th Cir. 1980)).

The court finds that the factors that Utah courts have considered in the parent-subsidiary context are also helpful when applying an alter ego analysis to closely related companies, even where the second company has not been formally created as a subsidiary of the first. Other courts have extended the alter ego doctrine in this context. For instance, applying Texas law, the Fifth Circuit has imposed liability on one company for the acts of a second company when the second company is "organized or operated as a mere tool or business conduit." Gardemal v. Westin Hotel Co., 186 F.3d 588, 593 (5th Cir. 1999). In that circumstance, the alter ego doctrine applies when there is "such unity" between the two companies that the "separateness of the two

[companies] has ceased" and holding only one company liable would "result in injustice." Id. To demonstrate alter ego, the plaintiff must produce "evidence showing a blending of identities, or a blurring of lines of distinction" between the two companies. Id. Finally, the court notes that it is not aware of any cases limiting the application of the alter ego doctrine to companies that have been incorporated, rather than those that have been organized as limited liability companies. See White Family Harmony Inv., Ltd. v. Transwestern West Valley, LLC, No. 2:05-cv-495-DAK, 2007 WL 2821798, at *12 (D. Utah Sept. 27, 2007) ("Corporations cannot escape contractual liabilities merely because they are set up as limited liability corporations.").

"A party alleging liability based on an alter ego theory bears the burden of proof on that theory at trial." Jones & Trevor Mktg., 284 P.3d at 639. But at this preliminary stage of the action, "courts have repeatedly recognized that the plaintiff's showing is less burdensome when attempting to impute contacts through an alter ego as opposed to establishing liability based on the actions of an alter ego." Larada Sciences, 2023 WL 2043300, at *18.

The Amended Complaint alleges that there is substantial overlap of ownership between CP Equity, the Guarantee Defendants, and the Alter Ego Defendants; that these Defendants use the same website and principal office; and that all entities are involved in the same kind of business. TCS further alleges that CP Equity and the Guarantee Defendants share the same officers and directors with the Alter Ego Defendants. The court therefore finds that TCS has plausibly alleged facts to support the "formalities requirement" prong of the alter ego analysis.

TCS has also alleged facts that support the "fairness requirement" prong. The Amended Complaint asserts facts that, taken in the light most favorable to TCS, demonstrate that the court would be justified in disregarding the corporate form. It is undisputed that CP Equity stopped making its payment obligations in April 2023. At the same time, two of the Alter Ego

Defendants (CP Services and CP Supply) were formed. In 2024, two Defendants (CP Services and CP Construction) issued statements announcing projects and suggesting that they had extensive funding—even though CP Equity continued to default on its repayment obligations. Taken together, these allegations plausibly imply that CP Equity and the Guarantee Defendants transferred assets to two newly formed and two currently existing business entities owned by overlapping parties as a means to avoid CP Equity's payment obligations. The court may therefore impute the minimum contacts that CP Equity and the Guarantee Defendants have with Utah to the Alter Ego Defendants.

Accordingly, the court finds that the exercise of jurisdiction over the Alter Ego Defendants is appropriate.

## II.    Utah Uniform Voidable Transfer Act

For similar reasons, the court declines to dismiss the UVTA claim against any of the Defendants. Under Utah Code Ann. § 25-6-202(1), a "transfer made … by a debtor is voidable as to a creditor … if the debtor made the transfer … with actual intent to hinder, delay, or defraud any creditor of the debtor[.]" The timeframe and allegations, while likely to be developed more fully during discovery, are sufficiently specific to state a claim for a fraudulent transfer. TCS alleges that, sometime around April 2023, CP Equity and the Guarantee Defendants transferred assets to the Alter Ego Defendants to avoid CP Equity's payment obligations. Indeed, while CP Equity continued to default on the payments required under the Amended Note, several of the Alter Ego Defendants announced new projects that included financing in the millions of dollars.

Moreover, as discussed above, TCS has plausibly alleged that the Alter Ego Defendants were, in fact, alter egos of the defaulting entity and its guarantors, thereby providing support for

TCS's allegations of fraudulent transfers under the UVTA. See, e.g., JENCO LC v. SJI LLC, 541 P.3d 321, 332–33 (Utah Ct. App. 2023) (noting that "badges of fraud" include evidence of transfer to insiders and concealment of the transfer); see also Utah Code Ann. § 25-6-202(2) (listing similar factors to establish that a transfer was made with "actual intent" to defraud a creditor).

The court therefore finds that TCS's allegations are pled with sufficient particularity to state a claim under the UVTA and to put all the Defendants on notice of the claims against them.

## ORDER

For the foregoing reasons, the Defendant's Motion to Dismiss (ECF No. 14) is DENIED.

SO ORDERED this 30th day of September, 2025.

BY THE COURT:

_Tena Campbell_
Tena Campbell
United States District Judge